## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SAVVAS CHARALAMBOUS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket no. 2:10-cv-375 |
| | ) | |
| ELIZABETH ROHNERT | ) | |
| CHARALAMBOUS, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Before the Court is Petitioner Savvas Charalambous' Verified Petition for Return of Child to Cyprus (Docket # 1). The Petition invokes his rights under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), opened for signature Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. At a conference of counsel on September 8, 2010, the Court granted Petitioner's request for expedited consideration and set this matter for an evidentiary hearing, which was held on October 6-7, 2010.

Prior to the hearing, there was discussion of the possibility of taking testimony from N.C. Petitioner filed his Motion in Limine to Exclude the Testimony of N.C. (Docket # 55) upon which the Court has reserved ruling. Ultimately, both sides rested without requesting that N.C. be called as a witness, thus, the Court hereby DENIES AS MOOT the Motion to Exclude.[1]

---

[1] The Court notes for the record that it would have granted this Motion to Exclude had Respondent pressed for N.C. to be called as a witness. In light of all of the evidence received, it appears N.C. is a seven year old child with insufficient maturity to offer reliable testimony on the matters at issue. Moreover, taking testimony from N.C. regarding the matters relevant to this Petition likely would have caused N.C. psychological harm. See Kufner v. Kufner, 519 F.3d 33, 40-41 (1st Cir. 2008) (finding no abuse of discretion in the district court's refusal to take testimony from an eight year old boy based on testimony from a child psychiatrist that further questioning could be harmful).

Based on the record now before the Court, the Court hereby GRANTS the Petition for Return (Docket # 1). In connection with this ruling, the Court makes the following findings of fact and conclusions of law:

## I.     FINDINGS OF FACT

### A.     The Parties

1.     Petitioner Savvas Charalambous ("Savvas" or "Father") is a citizen of Cyprus. For the last ten years, he has worked as a facilities manager at Amdocs in Limassol, Cyprus. He works from 8:30 AM until 5:30 PM during the week.

2.     Respondent Elizabeth Rohnert Charalambous ('Elizabeth" or "Mother") is a citizen of the United States. She has a degree in education. In Limassol, she has worked as a teacher and owned an educational toy store.

3.     N.C., the son of Savvas and Elizabeth, was born in Limassol, Cyprus in 2002. N.C. has been raised as a bilingual child and speaks both Greek and English.

4.     A.C., the daughter of Savvas and Elizabeth, was born in Limassol, Cyprus in 2008.

### B.     The Early Relationship & the Move to Cyprus

5.     Savvas and Elizabeth met while attending college in the United States in 1992. The couple was married in a civil ceremony in Virginia on November 25, 1996.

6.     The couple visited Cyprus for the first time in 1997.

7.     During this visit they discussed whether they might live in Cyprus. In addition to his parents, Savvas has three sisters and a large extended family living in Cyprus. The Charalambous family moved to Cyprus from the occupied side of the green line in 1974. Given

this family history, the extended family, which currently has over fifty members living in Cyprus, is very close and supportive of each other.

8.      Although Elizabeth's family resided in the United States, the couple ultimately agreed to move to Cyprus.

9.      In September 1997, Savvas moved back to Cyprus.  Elizabeth followed a couple months later just before Christmas.  Since December 1997, the couple has resided in Cyprus.

10.     For the first year, the couple lived with Savvas' mother.  They then moved into a three-bedroom apartment in Limassol, which remains the family's current residence.

11.     On June 28, 1998, Savvas and Elizabeth were again married in a religious ceremony in Cyprus. (Pet. Ex. 4A.)

12.     Savvas recalls the first five or six years in Cyprus as a happy time for the couple and that Elizabeth had a cordial relationship with his entire extended family.

13.     Elizabeth similarly testified that she felt the marriage was good until around 2000. She also testified that, as a result of her Catholic religious beliefs, she has strong reservations about divorce.

**C.      2002-2008**

14.     The couple had their first child, N.C., in 2002.  Elizabeth initially stayed home with the baby for nine months but had post-partum health issues that impacted her ability to take care of the baby.  Savvas continued to work full-time but took an active role in caring for the baby whenever he was not at work.  By all accounts, Savvas quickly developed a close bond with his son.

15.     The couple separated in early 2004 when N.C. was about 18 months old.  At that time, Elizabeth, alone, spent approximately four to six months in Maine with her parents.

During this time, Savvas and N.C. stayed in Cyprus. Savvas took care of N.C. with help from his family. Savvas and Elizabeth stayed in touch during the separation by phone and email. Savvas then came to Maine with N.C.

16.     Elizabeth hoped that Savvas would agree to remain in the United States in connection with this trip. However, ultimately, Mother, Father and son all traveled back to Cyprus.

17.     Around the time of the couple's 2004 separation, Savvas' family learned that Elizabeth, Savvas and N.C. were considering moving back to the United States. At that time, Savvas' sister invited Elizabeth to a lunch at her home. At lunch, female members of the Charalambous family berated Elizabeth for even considering leaving Cyprus.

18.     After some time at home following N.C.'s birth, Elizabeth returned to work as a teacher at a private elementary school in Cyprus. All told, Elizabeth worked for five years as a teacher in three different private schools. In 2006, Elizabeth, with the support of her husband, opened an educational toy store in Limassol. She operated the store for three years total. Ultimately, the business was not successful.

19.     In 2006, Elizabeth lost her father to pancreatic cancer. Savvas helped Elizabeth and her family take care of her father in Maine during his last weeks.

20.     In late 2008, Elizabeth & Savvas had their second child, A.C., a girl. According to Savvas, N.C. exhibited kind and gentle behavior towards his baby sister while living in Cyprus.

**D.      The Family's Life in Cyprus**

21.     Savvas has been an active and doting father who has participated in all aspects of the Children's daily lives. He takes N.C. to school each day and regularly interacts with N.C.'s teachers. When he is not working, Savvas enjoys doing activities with N.C., including going to

the beach and kayaking.  Savvas frequently engages the Children in physical play, including wrestling.

22.     Elizabeth is a caring mother.  She breastfed both N.C. and A.C. for a full year after each child was born.  She has actively participated in N.C.'s education.  Her young daughter, A.C., is understandably very attached to her mother.

23.     Elizabeth, Savvas, N.C. and A.C. reside in an apartment with three bedrooms, a living room, kitchen and two balconies, but with no yard.  N.C. has his own bedroom with a twin bed.  A.C. sleeps in a crib in her parents' bedroom.

24.     Elizabeth described the neighborhood as "a very bad part of town."  She testified that she has been stalked by men and propositioned as a prostitute while walking in her neighborhood in Cyprus, including times when she was with A.C.

25.     In Cyprus, the Children are in close contact with the extended Charalambous family, including Savvas' mother, known as "Yia Yia."  N.C. generally sees Yia Yia, who lives in an apartment about ten minutes away, about five times a week.

26.     Savvas' extended family gathers each Sunday at Yia Yia's house.  There are usually about twenty family members at these gatherings.  Approximately two years ago, Elizabeth stopped attending the weekly Charalambous family gatherings on account of her unwillingness to accept Yia Yia's use of physical discipline.  By that time, Elizabeth testified, she had observed Yia Yia repeatedly hit children in the family and that Yia Yia also had hit her on multiple occasions, including once hitting her in the abdomen shortly after she had an appendectomy.

27.     In 2008, N.C. attended a Sunday gathering at Yia Yia's house with his father.  He arrived home complaining of pain under his shirt.  Upon removing his shirt, Elizabeth observed a

welt on N.C.'s back. N.C. explained that his welt and pain were the result of getting hit by Yia Yia with a large wooden spoon when he did not eat. At the time, Savvas told Elizabeth that he had spoken with his mother about the incident and that it would not happen again. Elizabeth asked that all of N.C.'s future visits with Yia Yia be supervised. There is no evidence that this recurred.

28.     At home, N.C. had an evening routine with his Father that generally involved showering together, dressing for bed in underwear,[2] and then going to sleep together in the twin bed in N.C.'s room. At bedtime, they would read books. Savvas has slept with his son, N.C., since he was a baby. More recently, Savvas indicated he slept with N.C. to get a good night sleep after A.C. was born. Elizabeth testified that she has long disapproved of this routine and repeatedly asked that it stop.

29.     In Cyprus, N.C. struggled with some behaviors, including vengeful and defiant episodes, bed wetting, thumb sucking, sleep walking, problems controlling his bowels and nightmares, including fear of monsters in his bed. Notably, N.C. was less likely to sleepwalk when Savvas slept in the bed with him.

30.     Until coming to the United States, N.C regularly attended school in Cyprus. (See Pet. Ex. 4C & 4D.) In September 2004, N.C. began attending nursery school. (See Pet. Ex. 4B.) At the Mother's request, the parents agreed to transfer him to a different school last year. At this new school, his second grade class consisted of seven students and was taught by Mr. Stavros X'Varnava. N.C. completed second grade on June 16, 2010. (Pet. Ex. 4D.)

31.     Mr. X'Varnava testified that during the last school year N.C. did not exhibit any violence or behavioral problems and that he acted as a normal student. As N.C.'s teacher,

---

[2] At the hearing, this underwear was described as being of "speedo" or "bikini" cut, which is commonly worn by men and boys in Cyprus.

X'Varnava never saw any signs that N.C. was abused.  He also indicated that he would have a legal obligation to report any bruises or alleged abuse.

32.     Savvas' sister, Andrie Charalambous, a licensed social worker, has regularly babysat N.C. and A.C. in Cyprus.  She testified that she never saw any signs that the Children were abused.

33.     Dr. Georgiou Andros, the Children's pediatrician, has seen the Children for regular appointments and provided regular medical care in Cyprus.  He last saw the Children in June 2010.  At no time in his multiple examinations of the Children did he see any evidence, physical or otherwise, of abuse.  Similarly, he said that neither parent ever expressed concern that N.C. or A.C. had been abused.

34.     Having heard the testimony of both Mother and Father and handled pre-hearing issues regarding visitation and contact, it is clear that the Mother and Father currently have many unresolved disagreements regarding various aspects of childrearing and homemaking.  Among the issues upon which the parties have disagreed: (1) what food to feed N.C. for dinner; (2) how often and when N.C. should be allowed to eat sweets; (3) when it is appropriate to be less than fully clothed; (4) how N.C. should complete his homework; (5) which parent should be helping N.C. with his Greek lessons; (6) who was qualified to provide child care for N.C. and A.C.; (7) how to address defiant behavior by N.C.; (8) how to clean their home; (9) how to arrange their cupboards; and (10) how to spend the family's money.

35.     Most importantly, in the context of the pending Petition, the Mother and Father disagree about the proper methods for disciplining their children.  Savvas is more likely to use forms of physical discipline.  On multiple occasions, Savvas has disciplined N.C. by pulling his

ear, which N.C. has described as painful. Elizabeth favors the use of timeouts and reward systems as well as other techniques she has learned through parenting classes she has taken.

### E.    The Past Year in Cyprus (2009-2010)

36.    In August 2009, Elizabeth visited the United States to see her mother and attend a naval promotion ceremony for her brother. She brought A.C., then less than a year old, on the trip. During that visit, she began urging Savvas to again consider moving to Maine.

37.    Upon return to Cyprus, the couple began to have frequent arguments about whether they would move to the United States. By November 2009, Elizabeth believed she had convinced Savvas to move to the United States.

38.    These arguments about returning to the United States at times spilled over into conversations with family and friends. In fact, in an email to Elizabeth's mother, dated February 2, 2010, Savvas reluctantly indicated that he might have to consider moving to the United States; he also expressed a variety of concerns and acknowledged that the issue of where the family would reside was taking a toll on the marriage. (Pet. Ex. 5.)

39.    In early 2010, Elizabeth purchased three tickets for her and the Children to travel to the United States. Upon learning of this purchase, Savvas was upset and indicated he would not allow Elizabeth to take the Children on this trip without him.[3] Elizabeth did not purchase any ticket for Savvas because, in part, he had not obtained a visa. At this time, the couple disagreed as to whether any trip to the United States would be a vacation or a step towards a permanent move to the United States.

---

[3] Elizabeth testified that she believed there was a "stop list" in Cyprus and that Savvas could prevent her from leaving the country with their Children if he placed her name on the stop list. There was no testimony that such a "list" actually existed.

40.     The couple also began counseling in early 2010.  As part of that counseling, Elizabeth sent Savvas an email, dated March 10, 2010, in which she detailed all of the things she has loved about him both presently and in the past.  (See Pet. Ex. 13.)

41.     In an email to his mother-in-law, dated March 3, 2010, Savvas indicated that after additional thought he was "totally convinced" that the family "should not move to the states." (Pet. Ex. 6.)  He laid out a plan for how the family could be more comfortable in Cyprus and asked his mother-in-law to talk with Elizabeth and convince her to "stay with me."  (Pet. Ex. 6.)

42.     By all accounts, the issues raised at the counseling sessions combined with the disagreement as to where the family should live caused stress and repeated arguments between Elizabeth and Savvas.

43.     In April 2010, the couple had a memorable physical confrontation during which Savvas braced Elizabeth against a wall.  The parties disagree about whether this confrontation was the result of something said at a therapy session or as a result of Elizabeth pressing the issue of moving to the United States.

44.     Elizabeth testified about another incident in Spring 2010 in which Savvas lost his temper after hearing N.C. and Elizabeth discussing that N.C. had told one of his aunts (Savvas' sister) that the family was moving to the United States.  At that time, Savvas angrily told N.C. that he should not be telling other people "our secrets."  In Elizabeth's memory this incident also involved yelling by both parents, Savvas hitting N.C. and Elizabeth pushing Savvas in response.

45.     Sometime in the Spring of 2010, Elizabeth arrived home to find that A.C. had a dime-sized scrape on her nose.  Upon questioning Savvas, he indicated that A.C. sustained the injury as a result of his "gut reaction" to A.C. biting him.

46.     From the perspective of Savvas, Elizabeth's behavior and demeanor showed a marked improvement in the two months prior to the trip to the United States.  As a result, Savvas believed that the counseling was working and that the entire family was happy.  Elizabeth similarly noted a marked improvement in the couple's relationship in the month before she left for the United States.

**F.     The Removal and Retention of the Children in the United States**

47.     On or about June 18, 2010, Elizabeth, N.C. and A.C. left Cyprus to visit Elizabeth's family in Maine.

48.     On the day that Elizabeth and the Children were departing, Savvas drove them to the airport and the family played together while waiting to board the plane.

49.     At that time, Savvas anticipated Elizabeth and the Children would return in August 2010.  Elizabeth had, in fact, purchased return tickets but was not sure that they would be needed.

50.     While in Maine, Elizabeth and the Children have stayed with Katherine Rohnert, Elizabeth's mother and the Children's maternal grandmother.

51.     In the days immediately following the departure for the trip, Savvas was unable to contact Elizabeth or the Children by phone.  After approximately five days, he received an email from Elizabeth.  Savvas also began talking to the Children via Skype every three or four days.

52.     During the first few weeks of their visit to Maine, N.C. exhibited many behavioral issues and A.C. was extremely clingy to her mother.  Around this time, Elizabeth also noted some peculiar and sexualized behavior in both the Children.  Multiple people, including Mrs. Rohnert, observed N.C. engage in aggressive and defiant behavior during this time.

53.     In the early part of July, Elizabeth and Savvas exchanged some emails in which Elizabeth reported on the visit and expressed concern about N.C.'s behavior. (See Pet. Exs. 7, 8 & 9.) These emails do not raise or discuss explicitly any abuse allegations and are similarly silent on travel plans by any family member.

54.     Elizabeth testified that N.C.'s behavior improved as a result of her enrolling him in a community summer school program that provided him with structure and opportunities to socialize with other people.

55.     Elizabeth got a job working six hours a week. Elizabeth had hoped to get a job working even more hours to prove to Savvas that the family could stay in the United States. Ultimately, however, she found she needed to be with the children as they were having difficulties adjusting to their new living arrangements.

56.     On July 26, 2010, Savvas filed an Application for Return of his Children with the Central Authority in Cyprus. (See Pet. Ex. 4 & Ex. A to Verified Petition (Docket # 1-1).) He took this step as soon as he thought the Children would not be returning in August.

57.     As late as early September, Elizabeth still thought she might return to Cyprus if she could not convince her husband to move to the United States.

58.     In anticipation that the Children would return to Cyprus in time for start of the new school year, Savvas had registered N.C. for third grade. Meanwhile, Elizabeth enrolled N.C. in the Poland Community School this fall.

**G.      Developments Since the Filing of the Hague Petition**

59.     On September 16, 2010, N.C. was evaluated for abuse at the Androscoggin Children's Advocacy Center. The evaluation lasted three hours but was not completed. N.C. became visibly upset and fled the center during this attempted evaluation.

60. In late September (in preparation for the evidentiary hearing in this matter), N.C. was evaluated by the Spurwink Child Abuse Program. N.C. was reluctant to engage with the interviewer. At the hearing, the examiner testified that N.C.'s inability to separate from his mother was particularly unusual for a child his age and something she had experienced only very rarely in her fourteen years of practice. N.C. did tell the interviewer that he had "a secret" and that he would run away if his secret came out. After three separate interviews, the evaluator found there was insufficient evidence to support a finding of any sexual abuse. The evaluation did determine that N.C. had been subjected to inappropriate physical discipline in Cyprus; specifically, ear pulling by the Father and being hit with a wooden spoon by his paternal grandmother. The evaluator also concluded that N.C.'s behavior was "unusual" and "concerning" and mental health treatment was recommended to address apparent "behavioral and emotional issues." (Pet. Ex. 3 at 12.)

61. None of the multiple evaluations performed in connection with this hearing have concluded that N.C. or A.C. were physically or sexually abused by their Father.

62. Savvas has no present desire to live in the United States. He came to the United States in preparation for the hearing in this matter and has had supervised visitation with his Children.

63. Elizabeth testified that despite improvement in some of N.C.'s problematic behaviors over the summer, N.C.'s thumb sucking, obsession with sugary snacks and fears of monsters in his bed have returned since N.C. resumed spending time with his Father.

### H.    Risk Upon Return

64.    In Limassol, there are three child psychologists or therapists and it can be difficult to get an appointment.  There was no testimony about other resources in the capital Nicosia or the rest of the country, or social worker or alternate resources.

65.    Elizabeth believes that the services N.C. needs are more readily available in the United States.  Specifically, the Mother indicated she would seek to get N.C. in therapy with a child psychologist if he remained in Maine.  The Court notes that Elizabeth at no time sent NC for therapy in Maine aside from the evaluation related to the pending case.  She also testified that she believes there is a social stigma attached to receiving this type of mental health treatment in Cyprus.

66.    Elizabeth believes her marriage is now over.  As a result of these proceedings and the allegations she has made in the course of these proceedings, she genuinely does not believe that she can safely return to Cyprus.  She believes she would be "clobbered" in the street or shot dead.  No other evidence supports this belief.

67.    In Cyprus, there are laws and procedures for reporting domestic violence.  (Pet. Ex. 2.)  The Court heard testimony from Ioulia Kalimeri, an advisor and volunteer coordinator at the Apanemi Center[4] in Cyprus.  Based on her work in Cyprus, Ms. Kalimeri testified that very few officials are trained in the domestic violence laws of Cyprus and, as a result, the laws do not provide as much protection as might appear from reading the laws on their face.

68.    Cyprus currently has one shelter for victims of domestic violence with eight beds. This shelter is located in Nicosia.  In the absence of any shelter, victims of domestic violence in Limossal are able to stay in a hotel.

---

[4] The Apanemi Center is an independent nongovernmental organization that provides information and support for women and their families that suffer social exclusion, gender violence, domestic violence or sexual exploitation.

69.     Respondent genuinely believes that the extended Charalambous family in Cyprus would make it impossible for her to take advantage of any available protections under the law.

70.     Petitioner's sister, Andrie Charalambous, a licensed social worker in Cyprus, works for the Limassol Social Welfare Department.   Andrie has worked as an investigator in domestic family violence cases and has for the last few years been stationed at the local hospital.

71.     In the past, Savvas has made vague threats to Elizabeth about what he or his family would do to an overly assertive wife.  However, as indicated in Elizabeth's March 8, 2010 email to her husband, as of that date, he had never physically hurt her at any time.  Although Elizabeth testified that her husband owns knives and guns,[5] which he keeps in the apartment, there is no evidence that Savvas has ever used these items to harm or threaten his family or any individual.

72.     At the hearing, Elizabeth indicated that if the Children are sent back to Cyprus she will never see them again.

II.     **CONCLUSIONS OF LAW**

1.      N.C and A.C. (together, "the Children") were and continue to be located within the jurisdiction of this Court since the pending petition was filed.   Thus, the Court has jurisdiction over this matter pursuant to the Hague Convention and 42 U.S.C. § 11603.

2.      Petitioner has established by a preponderance of the evidence that the Children have been wrongfully retained in Maine.

3.      A respondent opposing the return of a child pursuant to Article 13(a) must prove the allegations supporting this "consent or acquiescence" exception by a preponderance of the evidence.  See 42 U.S.C. § 11603(e)(2)(B).

---

[5]  At least one of those guns is from Savvas' time serving in the Cyprus military.

4.      Respondent has not met her burden with respect to showing Petitioner's consent or acquiescence to her plan to keep the Children in the United States.

5.      A respondent opposing the return of a child pursuant to Article 13(b) must prove the allegations supporting this "grave risk" exception by clear and convincing evidence.  <u>See</u> 42 U.S.C. § 11603(e)(2)(A).

6.      Respondent has not shown by clear and convincing evidence that returning the Children to Cyprus will expose them to physical or psychological harm or otherwise place them in an intolerable situation.

7.      Pursuant to Article 26 of the Hague Convention and 42 U.S.C. § 11607(b)(3), the Court "shall order the [R]espondent to pay necessary expenses incurred by or on behalf of the [P]etitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the [R]espondent establishes that such order would be clearly inappropriate."  42 U.S.C. § 11607(b)(3).  In order to comply with this provision of ICARA, Petitioner shall file an itemized bill of said costs within 30 days of the expiration of the time for filing a timely appeal.  Respondent may respond with any objections to Petitioner's itemized bill of costs within 14 days.

III.    **DISCUSSION**

A.  **Petitioner's Prima Facie Case of Wrongful Retention**

Under Article 3 of the Hague Convention, the removal or retention of a child is deemed wrongful where "it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention"

and "at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention."  Hague Convention art. 3.

Petitioner bears the burden of showing by a preponderance of the evidence that N.C. and A.C. have been wrongfully retained in Maine.  See 42 U.S.C. § 11603(e)(1)(A).  To do this, he must show:  (1) that the habitual residence of the Children was Cyprus immediately prior to the time of the retention; (2) that he had custody rights over the Children at the time of the retention; and (3) that he was exercising those custody rights.  See, e.g., Nicolson v. Pappalardo, 605 F.3d 100, 103 (1st Cir. 2010).

A child's "habitual residence" is a mixed question of law and fact and is intended to be a fluid concept to allow for the consideration of the specific facts of each individual case.  The majority of federal courts look to the "parents' shared intent or settled purpose regarding their child's residence" in initial determinations of a child's habitual residence.  Nicolson, 605 F.3d at 104 & n.2 (collecting cases).  In this case, "an objective observer," id. at 104, would view Cyprus as the residence of both N.C. and A.C.  Both children were born in Cyprus and have resided there except for trips to the United States to see Elizabeth's family.  N.C. has regularly attended school there for a number of years and was registered to begin third grade in September 2010.  Based on the evidence at the hearing, the Court concludes that the parents shared an intent to make Cyprus their family home beginning in 1997.  See Holder v. Holder, 392 F.3d 1009, 1020 (9th Cir. 2004) ("[I]f a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country.")  On the record before the Court, it is clear the parents now have different intents; however, this difference in opinion cannot serve as a basis for changing the established habitual residence of the Children.

Additionally, under Cyprus law,[6] Savvas had joint custody rights over the Children at the time of the retention. Up until the time the Children were wrongfully retained, there is no real dispute that Petitioner was exercising those custody rights. Thus, Savvas has established a prima facie case of wrongful retention.

**B. Hague Convention's Defenses & Exceptions**

"A child retained abroad over objection must be returned to his or her state of habitual residence unless the respondent can establish one of the provided-for defenses or exceptions. . . . The exceptions are 'narrow' and must be narrowly construed." Nicolson, 605 F.3d at 105 (citations omitted). In this case, the Mother asserts two possible defenses: (1) that the Father "consented to or subsequently acquiesced in the removal of retention" of N.C. and A.C. or (2) that "there is a grave risk that . . . return [of the Children] would expose [them] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Hague Convention art. 13(a) & (b). The Court addresses each of these defenses in turn.

**1. Consent or Acquiescence**

A respondent opposing the return of a child on the grounds of consent and/or acquiescence must prove that either exception applies by preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B).

Consent "focuses on [the Father's] intent *prior* to the . . . retention" and "may be evinced by the petitioner's statements or conduct, which can be rather informal." Nicolson, 605 F.3d at 105 (citations omitted). However, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." Baxter v. Baxter, 423 F.3d 363, 371 (3rd Cir. 2005) (citations omitted). There was evidence that Elizabeth was planning not to return to Cyprus at

---

[6] See Pet. Ex. 1 (sections of Cyprus' "Parents and Children Relations Law No 216 of 1990," as amended until 2008).

the time of departure in June 2010 and that she attempted to convince her husband that the entire family should move to the United States.  However, the preponderance of the evidence also shows that Savvas resisted these attempts and would have refused to allow Elizabeth to take the Children to the United States for anything other than a vacation.  Ultimately, Respondent cannot carry her burden to show that Petitioner consented to relocating the Children to the United States permanently.[7]

### 2.    Grave Risk

Alternatively, Respondent also seeks to establish the "grave risk" exception to return under the Hague Convention, which requires her to prove by clear and convincing evidence that there is a grave risk that returning to Cyprus will expose the Children to "physical or psychological harm or otherwise place [them] in an intolerable situation."  Hague Convention art. 13(b).  "Under Article 13(b), 'grave' means a more than serious risk" but it need not be an immediate risk.  Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002) (Danaipour I) (citing Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. at 10,510.); see also Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) ("The Convention does not require that the risk be 'immediate'; only that it be grave.")

---

[7] Although Respondent mentions acquiescence in her prehearing brief, there was no evidence of acquiescence or discussion of acquiescence at the hearing   "[A]cquiescence under the Convention requires either:   an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written enunciation of rights; or a consistent attitude of acquiescence over a significant period of time."  Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996).  The First Circuit has noted that entry of a consent order providing permanent custody to the respondent parent would amount to "formal acquiescence" by a petitioning parent.  Nicolson, 605 F.3d at 106. In Nicolson, the First Circuit also indicated that courts could infer acquiescence by conducting a subjective intent inquiry of a parent's intentions.  Id. at 107 & n.5.  When courts have inferred acquiescence, there has typically been a clear pattern of behavior on the part of the petitioner indicating a lack of interest in the child and/or in obtaining the return of the child. Here, there is no evidence of any consent order and the Petition for Return was filed quickly and pursued vigorously.  See, e.g., In re Leslie, 377 F. Supp. 2d 1232, 1247 (S.D. Fla. 2005) (petitioner's relentless pursuit of legal channels in two countries is inconsistent with acquiescence); Bocquet v. Ouzid, 225 F. Supp. 2d 1337, 1351 (S.D. Fla. 2002) (where petitioner fought consistently to have child returned there was no acquiescence). In short, in this case, there is no evidence to support acquiescence by the Father.

The evidence presented to support this defense falls into three categories: (1) sexual abuse of the Children, (2) physical abuse of the Children and (3) spousal abuse of the Mother. The Court discusses each of these allegations in turn.

**1. Sexual Abuse**

Under First Circuit precedent, clear and convincing evidence of sexual abuse by a petitioner can place a child in an "intolerable situation and support a grave risk exception to return." Danaipour I, 286 F.3d at 15-16; Danaipour v. McLarey, 386 F.3d 289, 296 (1st Cir. 2004) (Danaipour II) (upholding district court's sexual abuse finding). "A finding that a child is currently not experiencing severe psychological effects of sexual abuse is not necessarily dispositive" of the grave risk question. Danaipour I, 286 F.3d at 17. Notably, while a court must make a determination as to whether alleged abuse did or did not occur, the Court need not have a full forensic evaluation before it in every case to make such a determination. See id. at 19 n.14.

In this case, there is no clear and convincing evidence of sexual abuse. In fact, Respondent has simply not established by any evidence that her Children were sexually abused by their Father or anyone else living in Cyprus. The "sexualized behavior" noted by the Mother, which she now sees as a sign of sexual abuse, has simply not been corroborated by any other evidence or testimony. To the extent that N.C. has exhibited some behaviors and reactions in the United States that may be consistent with sexual abuse, those behaviors may also be explained by some other event, such as the stress of being brought to the United States and being separated from his Father with whom he has an undeniably close relationship. The Court firmly believes based on the evidence that both parents love their children and neither would or did sexually abuse them. In short, this case is factually distinguishable from Danaipour II.

## 2.    Physical Abuse

In order to establish a grave risk defense based on physical abuse, the First Circuit has generally required "a sustained pattern of physical abuse and/or a propensity for violent abuse." McManus v. McManus, 354 F. Supp. 2d 62, 70 (D. Mass. 2005) (declining to find grave risk based on "serious" harm and a history of "physical discipline and psychological distress") (collecting cases).  The evidence of physical abuse of the Children in this case is limited and by no means sustained.  The Court has found that N.C. was hit once by his grandmother with a wooden spoon and that his Father has physically disciplined him on multiple occasions by pulling his ear.  With respect to A.C., the evidence shows that on one occasion her father caused a scrape to her nose when he reacted to being bitten.  There is no clear and convincing evidence to support a finding of grave risk based on physical abuse of the Children.

## 3.    Spousal Abuse

The Supreme Court has recently recognized that a mother might demonstrate "grave risk" to "her own safety" and thereby establish that "the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'"  Abbot v. Abbot, --- U.S. ---, 130 S. Ct. 1983, 1997 (2010) (citing Baran v. Beaty, 526 F.3d 1340, 1352-53 (11th Cir. 2008) & Walsh v. Walsh, 221 F.3d 204, 220-21 (1st Cir. 2000)). In Walsh, there was ample evidence to support severe spousal abuse over an extended period as well as a well-documented history of violence and disregard for the law.  See Walsh, 221 F.3d at 209-12.  However, few cases have managed to present a similar "clear and long history of spousal abuse," id. at 220, to support a grave risk defense.  See, e.g., Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) ("Lynn's allegations of verbal abuse and an incident of physical shoving are distinct from the 'clear and long history of spousal abuse' presented in Walsh.")

In this case, the Court does not condone or seek to minimize the verbal and emotional abuse Elizabeth claimed that she has experienced during her marriage. However, crediting all of her testimony,[8] the Court is left with a finding that Elizabeth was subjected to some verbal and emotional abuse and that there was one incident of physical abuse. This incident did not require any medical treatment. This limited history of abuse does not rise to the level of spousal abuse found in Baran or Walsh. See Baran, 526 F.3d at 1342-43 (detailing repeated incidents of physical abuse and threats against mother and child); Walsh, 221 F.3d at 209-212 (detailing five years of "violent behavior toward . . . wife and others"). Additionally, the record does not reflect that N.C. and A.C. have witnessed their father being abusive toward their mother. Likewise, there is nothing in the record that would allow the Court to conclude that the Children will witness spousal abuse upon return to Cyprus. Rather, the Mother testified that the marriage is over and she will not return to Cyprus under any circumstances. Thus, the Court cannot conclude the Children would suffer from psychological harm or be placed in an intolerable situation based on spousal abuse if they are returned.

Finally, the Court considers whether the combined evidence related to physical abuse and spousal abuse, along with the more generalized evidence relating to the influence of the Charalambous family in Cyprus, supports a grave risk defense. Quite simply, the total weight of the evidence does not present a clear and convincing case of grave risk. Ultimately, the grave risk defense is a narrow one and the Court must be careful to avoid "substituting a best interest of the child analysis for the analysis the Convention requires." Whallon, 230 F.3d at 460.

---

[8] Notably, the Court's findings do not recite Elizabeth's testimony verbatim. In the Court's assessment, Elizabeth lacked credibility in some respects given her interests in the outcome of this matter and her apparent fragile emotional state. Notably, Savvas' testimony also lacked credibility in that his lack of memory as to certain events (e.g. the wooden spoon incident) clearly reflected his desire to avoid any testimony that did not support his desired outcome on this Petition. On many issues as to which Savvas and Elizabeth are the only direct witnesses, there was significant disparity in their testimony.

This is a sad case. The Mother now genuinely believes that a return to Cyprus would place her in an intolerable situation. Thus, she has indicated she will not return to Cyprus. However, her subjective perception of a threat is not corroborated by other evidence in the record. Ultimately, the Court cannot and will not order the Mother to return to Cyprus. See Simcox v. Simcox, 511 F.3d 594, 610 (6th Cir. 2007) (finding an undertaking that required the Mother to accompany the Children back to Mexico is inappropriate based on the assumption that the Court may not compel the return of the parent, only the abducted children); Fabri v. Pritikin-Fabri, 221 F. Supp. 2d 859, 873 (N.D. Ill. 2001) (noting that the mother could choose to accompany the child back to Italy or the Child would return with the father).

It is horribly sad to consider the possibility that these Children may lose all contact with their Mother as a result of being returned to Cyprus. Although the Court received no evidence as to how this might impact the Children, the Court can only imagine that it will be traumatic, especially for A.C. [9] However, the alternative of allowing these children to remain wrongfully retained in this country is equally likely to traumatize the Children. As the Supreme Court recently noted in Abbott:

> An abduction can have devastating consequences for a child. 'Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse.' A child abducted by one parent is separated from the second parent and the child's support system. Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues. A child abducted at an early age can experience loss of community and stability, leading to loneliness, anger, and fear of abandonment. Abductions may prevent the child from forming a relationship with the left-behind parent, impairing the child's ability to mature.

---

[9] It is notable that two separate Hague cases in this country have indicated that Greek courts have improperly broadened the scope of the grave risk defense when they concluded that the defense was satisfied by the fact that young children would be separated from their mother and thereby be exposed to psychological harm or placed in an intolerable situation. See Asvesta v. Petroutas, 580 F.3d 1000, 1020-21 (9th Cir. 2009); Diorinou v. Mezitis, 237 F.3d 133, 144-45 (2d Cir. 2001) (describing the "Greek courts' use of Article 13(b)" as "involv[ing] little more than an assessment of the children's best interests").

130 S. Ct. at 1996 (internal citations and quotations omitted).   In short, the impact of any loss of contact with the Mother is something that must be resolved by the courts of the Children's habitual residence.   See, e.g., Walsh, 221 F.3d at 218 (noting that the harm for a grave risk exception "must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another'") (quoting Re. A. (a Minor) (Abduction) [1988], 1 F.L.R. 365, 372 (Eng.C.A.)).

**III.     CONCLUSION**

The Court hereby GRANTS the Petition for Return (Docket # 1) subject to the following undertakings:

1.     Respondent is ORDERED to turn over the Children to the custody of the Petitioner not later than Wednesday, October 20, 2010.

2.     Respondent shall not remove N.C. and A.C. from the District of Maine absent prior approval by this Court.   Upon receipt of an affidavit from Respondent or Petitioner indicating that the Children's passports will be used solely for the purpose of travel to Cyprus in accordance with this Order, the Clerk shall return the passports of N.C. and A.C. to the affiant.

3.     The parties shall seek a determination as soon as possible from a court of competent jurisdiction in Cyprus regarding the custody, support, and visitation with respect to the Children.

4.     The Court will welcome amendments to these undertakings upon mutual agreement by the parties.

5.       Nothing in this Order shall prevent the relevant courts in Cyprus from making an

independent determination with respect to the custody of N.C. and A.C.


SO ORDERED.


                                                  /s/ George Z. Singal
                                                  U.S. District Judge

Dated at Portland, Maine on this 12th day of October, 2010.